1

2

3

4

5

6

7

8                      **UNITED STATES DISTRICT COURT**

9                     **CENTRAL DISTRICT OF CALIFORNIA**

10

11

12   PATRICK JAMES KITLAS,         )        No. LACV 08-6651-GHK (LAL)
                                    )
13              Petitioner,         )        FINAL REPORT AND RECOMMENDATION
                                    )        OF UNITED STATES MAGISTRATE JUDGE
14        v.                        )
                                    )
15   F.B. HAWS, Warden,             )
                                    )
16              Respondent.         )
     _____)

17

18        This final Report and Recommendation[1] is submitted to the

19   Honorable George H. King, Chief United States District Judge, pursuant

20   to 28 U.S.C. § 636 and General Order 194 of the United States District

21   Court for the Central District of California.  For the reasons stated

22   below, the petition for habeas corpus relief should be denied and this

23   action dismissed with prejudice.

24   //

25   //

26   _____

27        [1]  The court herein corrects typographical errors in the initial
     Report and Recommendation filed February 12, 2016; no changes are made
28   to its substance.

# I.  PROCEDURAL HISTORY

Petitioner, a prisoner in state custody, challenges a conviction in California Superior Court, Los Angeles County.  On November 9, 2005, a jury found Petitioner guilty of second degree murder (Cal. Penal Code § 187), first degree residential robbery (Cal. Pen. Code § 211), and first degree burglary (Cal. Pen. Code § 459).  [Clerk's Transcript ("CT") at 658-661, 664-65.]  On January 19, 2006, the trial court sentenced Petitioner to state prison for fifteen years to life on the murder conviction, six years on the burglary charge, and a concurrent three year term on the robbery charge.  [CT at 667-73.]

Petitioner appealed.  [Lodged Document ("Lodg.") 5.]  The California Court of Appeal affirmed the judgment in an unpublished reasoned opinion on July 23, 2007.  [Lodg. 8.] Petitioner then filed a petition for review.  [Lodg. 9.]  On October 17, 2007, the California Supreme Court denied review without comment or citation.  [Lodg. 10.]

On October 9, 2008, Petitioner filed the instant Petition for Writ of Habeas Corpus by a Person in State Custody ("Petition"), alleging the following five claims for relief: (1) the trial court erred in not suppressing the fruits of an unconstitutional search and seizure; (2) the prosecution engaged in purposeful discrimination during jury selection in violation of Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986); (3) the trial court erred when it refused to instruct on voluntary manslaughter as a lesser-included offense; (4) Petitioner was the victim of entrapment by a government agent, and the trial court failed to instruct on entrapment sua sponte; and (5) Petitioner was denied effective assistance of counsel when trial counsel failed to pursue an entrapment defense.  [Docket no. 1.]

On February 9, 2009, Respondent filed a motion to dismiss the

Petition on the ground that Petitioner's fourth and fifth claims, relating to an entrapment defense, were not exhausted and that the Petition was thus mixed.  [Docket no. 9.]  On March 9, 2009, Petitioner filed an opposition, in which he conceded that grounds four and five were unexhausted, argued for a stay, and asked the Court to amend the Petition to delete the unexhausted claims if it denied the stay.  [Docket no. 11.]  In an order filed on July 22, 2009, the Court denied Petitioner's request for a stay and abeyance, granted Petitioner's request to strike the unexhausted claims four and five, and denied Respondent's motion to dismiss.  [Docket no. 12.]

On August 14, 2009, Respondent filed an Answer to the Amended Petition.  [Docket no. 13, "Answer."]  Thereafter, on November 20, 2009, Petitioner filed his Reply to Respondent's Answer.  [Docket no. 18, "Reply."]

On September 29, 2010, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court, raising his two entrapment-related claims.  [Lodg. 11.]  On May 11, 2011, the California Supreme Court denied the petition with citation to In re Robbins, 18 Cal.4th 770, 780 (1998).  [Lodg. 12.]

While his state habeas petition was pending before the California Supreme Court, Petitioner requested that this Court reconsider the denial of his motion for stay and abeyance. [See Lodg. 21.] On March 9, 2011, the Court ordered the proceedings stayed pursuant to Kelly v. Small, 315 F.3d 1063 (9th Cir. 2003).  [Lodg. 22.]

On June 27, 2011, Petitioner filed a motion seeking leave to amend the Petition to add his newly exhausted claims.  [Lodg. 27.]  On August 3, 2011, Respondent filed an opposition to Petitioner's motion to amend.  [Lodg. 29.]  Petitioner filed a reply on April 25, 2012.

3

[Lodg. 34.]

On May 9, 2012, this Court determined that an evidentiary hearing might be required with respect to Petitioner's Batson claim. Consequently, the Court appointed the Federal Public Defender to represent Petitioner. The Court also denied Petitioner's motion to amend his newly exhausted entrapment-related claims without prejudice to his counsel later re-raising the motion.[2] [Docket no. 35.]

On July 25, 2012, Respondent filed a motion asking the Court to reconsider its order granting an evidentiary hearing. [Docket no. 39.] Petitioner filed an opposition to Respondent's motion on August 10, 2012. [Docket no. 40.] In an order filed on August 23, 2012, the Court found that an evidentiary hearing was warranted, and consequently denied Respondent's motion. [Docket no. 41.]

On September 28, 2012, the Court held an evidentiary hearing on Petitioner's Batson claim. [See Docket nos. 46, 47.] On November 16, 2012, Petitioner and Respondent each filed a brief regarding whether codefendant Mark Itaev's jury-selection proceedings could properly be considered in deciding Petitioner's Batson claim and whether additional evidence should be received.[3] [Docket nos. 51, 52.] On December 7, 2012, without reaching the merits of Respondent's objections to consideration of the Itaev jury selection, the Court ordered that the record should be expanded to include additional evidence relating to those proceedings. [Docket no. 55.] On December 10, 2012, Petitioner and Respondent each filed a reply brief regarding

---

[2] Subsequently, in an email dated August 20, 2012, Petitioner's counsel advised Respondent and the Court that Petitioner would not seek to amend the Petition.

[3] Petitioner and his codefendant were tried jointly, with a separate jury empaneled for each defendant

1    admissibility of the Itaev evidence, and on January 7, 2013,

2    Respondent lodged the additional evidence.[4] [Dockets nos. 53, 54.]

3        On February 14, 2013, Petitioner filed a post-evidentiary hearing

4    brief. [Docket no. 59, "Pet.'s Post-Evid. Brief."]  On April 10,

5    2013, Respondent filed his post-evidentiary hearing brief. [Docket

6    no. 60, "Resp.'s Post-Evid. Brief."]  On May 15, 2013, Petitioner

7    filed a post-evidentiary hearing reply brief. [Docket no. 61, "Pet.'s

8    Post-Evid. Reply."]

9                        **II.   BACKGROUND**

10       On direct review, the state court of appeal summarized the trial

11   evidence as follows:

12           A.   Background

13           Sometime before the Spring of 2004, Itaev, then 30

14       years old, befriended [Petitioner], then 19 years old, and

15       [Petitioner's] girlfriend Audrey Lane, then 18 years old.[5]

16       [Petitioner] and Lane were homeless and living on the

17       streets.  Itaev sometimes allowed [Petitioner] and Lane to

18       stay with him in motel rooms he rented.  During April – June

19       2004, Itaev was involved in a sophisticated identity theft

20       business in which he acquired and used other people's

21       identification information to obtain false identification

22       documents, produce and cash fraudulent checks, and

23   ────────────────────────

24       [4]  As noted below, the Court has determined that it is
     appropriate to admit and consider the Itaev evidence in deciding

25   Petitioner's Batson claim.  See note 12, infra.

26       [5]  Originally, Lane also was charged with the count 1 murder, but
     the magistrate reduced that charge against her at the end of the

27   preliminary hearing.  The first Information charged Lane only with
     being an accessory to the murder.  (§ 32, count 9.)  Before trial, as

28   part of a plea bargain, she pleaded guilty to that charge.  She
     testified as a prosecution witness at trial.

fraudulently use others' credit accounts.  These acts resulted in the filing of counts 4-8, which were alleged to have occurred between April 24 and June 2, 2004, and of which Itaev's jury convicted him.  Although police found [Petitioner] and Lane staying in motel rooms with Itaev in which evidence of identify theft was found, neither [Petitioner] nor Lane was charged with any identify theft-related crimes.[]

Also during the Spring of 2004, Itaev and his uncle Gary Itaev (hereafter, Gary) were informants for federal authorities.  The Itaevs' relationship as federal informants grew out of an attempt to assist Gary's brother Meir, who had been convicted of federal crimes and was awaiting sentencing.  Itaev and Gary had agreed with federal authorities to report crimes of which they learned in exchange for possible reductions in Meir's sentence.

B.   The Murder of Aleksander Markzitser

Early in the morning of June 8, 2004, sheriff's deputies found Markzitser's corpse lying on his bed in his apartment, which had been ransacked and bore signs of a struggle: the telephone lines had been neatly cut, interior doors showed signs of forced entry, and knickknacks on a table were overturned.  In contrast, Markzitser's body was neatly clothed, and the sheets on his bed were neat, leading the deputies to suspect that he may have been killed elsewhere in the apartment and his body later placed on the bed.  A neighbor found Markzitser's identification in the apartment laundry room.  Deputies found [Petitioner's] and

Itaev's fingerprints inside the apartment, [Petitioner's] on the top of a bedroom dresser, Itaev's on the inside and outside of two drawers of a bedroom nightstand and on a cordless telephone.  They also found a condom in a sealed wrapper on the floor between the living room and hallway. An autopsy disclosed that Markzitser had been strangled to death, both manually and with a ligature, and had a blood alcohol level of 0.10 percent, corresponding to two to three drinks in a man of his weight.  Although he did not testify, [Petitioner] did not dispute that he, Itaev, and Lane were with the victim in his apartment during the evening before his death, and that [Petitioner] choked and bound Markzitser.  Rather, [Petitioner's] defense at trial was that he left Markzitser alive and Itaev later killed him.

Lane testified that on the evening of June 7, several hours before the murder, she, [Petitioner], and Itaev met outside a friend's apartment.  [Petitioner] and she were looking for a place to spend the night when Markzitser joined the trio.  After a brief conversation, Markzitser, Itaev, and Lane (but not [Petitioner]) walked to Markzitser's nearby apartment to allow Lane to use the bathroom.  While at the apartment, Markzitser drank some Vodka and Itaev called his mother on Markzitser's telephone. No one tried to kiss or touch Lane or discussed sex.  When the three then went out to buy more alcohol, Lane left her backpack inside, thinking they would return shortly.

On the street, Markzitser, Itaev, and Lane met [Petitioner], who kissed Lane.  Markzitser returned to his

apartment, leaving the trio together on the sidewalk.  At some point, Itaev told Lane that Markzitser "was basically a dirty old man who was sort of a pervert."  Itaev suggested that "we knock [Markzitser] out, or that [Petitioner] knock [Markzitser] out so we could stay in his apartment," and that they "take over [Markzitser's] payments for the apartment."  Itaev told [Petitioner], "'You don't have the balls to do it.'"  Leaving Itaev and Lane on the sidewalk, [Petitioner] went to Markzitser's apartment to retrieve Lane's backpack.

About 10 minutes later, when [Petitioner] had not returned, Lane went to the apartment to look for him.  She found the front security door open and the interior door ajar.  She walked inside and saw [Petitioner] standing next to Markzitser, who was lying face down on the floor, hog-tied with telephone cords, and breathing heavily.  Lane scolded [Petitioner] for doing something stupid, grabbed her backpack, and left.  Meeting Itaev where she had left him, she told him what [Petitioner] had done.  Itaev then walked to the apartment alone but returned in about 10 minutes and told Lane that [Petitioner] had killed Markzitser or that Markzitser had stopped breathing.  Itaev was nervous and said that he and Lane were innocent and [Petitioner] was responsible.  About 10 minutes later, [Petitioner] returned, carrying a computer case he had taken from the apartment and wearing a jacket Lane had never seen before.  The trio walked to a convenience store where Itaev called someone.

Itaev's uncle Gary testified that early on the morning

of June 8, Itaev called him reporting that someone had been murdered and he needed help.  When Gary picked up Itaev, Itaev stated that [Petitioner] and Lane had killed a man who had offered to let the couple sleep in the victim's apartment in exchange for having sex with Lane.  At this point in Itaev's narrative [Petitioner] walked up to the car.  Itaev told Gary that [Petitioner] was the killer and to let him in so they did not lose him.  The three drove to a convenience store where Itaev and [Petitioner] got out of the car to join Lane.  Gary drove off saying he would find a place for them to stay.  After telephoning an attorney, Gary returned, picked up the trio, and told them he would lodge them in a hotel for the night and pick them up in the morning.  (Gary's and Itaev's plan was to send police to the hotel to detain or arrest [Petitioner] and Lane.)  On the way to the motel, Itaev asked [Petitioner], "'Did you kill the guy?'"  [Petitioner] responded, "'Cool down.  Cool down. That's okay.  Yes, I did.'"  When Itaev asked why, [Petitioner] replied, "'Chill out.  Chill out.[] It's okay. It's already over.  That's what I do for a living.'" [Petitioner] also said, "'Don't worry.  This is not my first time.  I already did that 74 times.  That's what I do for a living.'"  Gary described [Petitioner] as calm, and Itaev as agitated, during this conversation.

At the motel, Gary rented a room in his name alone using his credit card, and gave [Petitioner] the room key. [Petitioner], Lane, and Itaev went to the room.  Itaev left after about 10 minutes.

Lane testified that while Itaev was in the room, he suggested that they return to Markzitser's apartment and burn it so the body would not be found.  Lane replied that the scheme would fail because forensic science would disclose that the fire was intentionally set and a body was present.  [Petitioner], who was laughing and gloating, showed Lane some watches and cigarettes and said that Lane "didn't think he had the balls to do it."  After Itaev left, [Petitioner] and Lane went to sleep.

Early on the morning of June 8, an attorney telephoned a sheriff's deputy and, after a brief conversation, put Itaev on the line.  Itaev told the deputy that [Petitioner] and Lane had killed a man who, before his death, had told Itaev that he liked Lane.  Itaev told the deputy that he and Gary had put [Petitioner] and Lane up in a motel room so the authorities could find them.

Deputies responded to the motel where they met with Gary and Itaev.  Itaev told the deputies that [Petitioner] and Lane had murdered and robbed Markzitser.  Itaev claimed that [Petitioner] learned that Markzitser had tried to kiss Lane and may have become jealous of Markzitser.  Itaev said he, [Petitioner], and Lane were staying at the motel in a room Gary had rented for them.  Both Gary and Itaev gave the deputies permission to enter the room.  A deputy confirmed with the motel clerk that Gary had rented the room and the deputy obtained the key.  Using the key to enter the room, the deputies found [Petitioner] and Lane sleeping and saw watches, a set of keys, and a Russian birth certificate in

1    plain view on the floor.  [Petitioner] and Lane were

2    detained while deputies searched Markzitser's apartment and

3    discovered his body.  [Petitioner] and Lane were then

4    arrested.

5        Two deputies interviewed [Petitioner] after he waived

6    his <u>Miranda</u> rights.  (<u>Miranda v. Arizona</u> (1996) 384 U.S.

7    436.)  After initially claiming that he only took items from

8    Markzitser's apartment at Itaev's invitation and had no

9    involvement in the murder, [Petitioner] admitted he killed

10   Markzitser.  [Petitioner] explained that when Itaev and Lane

11   returned from their first visit to the apartment, Itaev

12   suggested that [Petitioner] "knock [Markzitser] out... [a]nd

13   then tie him up[]" so the trio could "take everything

14   valuable out of the house" and "take over the apartment,

15   take over the payments, take over rent, take over

16   everything."  Itaev told [Petitioner] that "he wanted to see

17   if [Petitioner] had the balls to do it."  [Petitioner]

18   claimed that Itaev hinted that if [Petitioner] refused,

19   Itaev would harm Lane.  [Petitioner] went to the apartment

20   alone, obtained entry under the ruse of retrieving Lane's

21   backpack, and, after he did so, "put [Markzitser] in a

22   headlock and he fell down[,]" hit his throat on a table, and

23   [Petitioner] "heard it crack.  But [Petitioner] did just

24   like [Itaev] told me to and... tied his hands behind his

25   back."  [Petitioner] also tied a cord around Markzitser's

26   neck.  Lane entered the apartment, "saw [Petitioner] tying

27   [Markzitser] up[,]" and left.  [Petitioner] claimed that

28   Itaev then entered the apartment, said to put Markzitser on

1    the bed, took some items, and left.  [Petitioner] complied,

2    but claimed he thought Markzitser was only asleep and that

3    he intended to knock Markzitser out, not to kill him.

4    [Petitioner] took the jacket, watches, and birth certificate

5    and returned to Lane and Itaev.  Gary arrived and picked

6    them up.  On the way to the motel, [Petitioner] "told

7    [Itaev] that [he] did it."  Itaev replied, "I never told you

8    to do that."  [Petitioner] did not reply.  Gary rented the

9    room for them "to cool off for the night."  Itaev spent a

10   few minutes with [Petitioner] and Lane in the motel room,

11   suggested that they burn Markzitser's apartment, then left.

12   [Petitioner] did not claim that either Lane or Itaev

13   reported that Markzitser made any sexual advances towards

14   Lane, nor did [Petitioner] claim he was angry before or

15   during the killing, which he explained was motivated only by

16   fear that Itaev would harm Lane if [Petitioner] failed to

17   carry out the attack.

18   [Lodg. 8 at 3-7 (footnote in original).]

19                  **III.   PETITIONER'S CLAIMS**

20        Petitioner states the following claims for federal habeas relief:

21   1.   The warrantless search of Petitioner's motel room violated his

22        Fourth Amendment rights.

23   2.   The trial court violated Petitioner's equal protection rights

24        when it denied Petitioner's motion under Batson v. Kentucky, 476

25        U.S. 79, 106 S. Ct. 1712 (1986) and People v. Wheeler, 22 Cal.3d

26        258, 148 Cal. Rptr. 890 (1978).

27   3.   The trial court erred by failing to instruct on voluntary

28        manslaughter as a lesser included offense of murder.

[Petition at 5-6; Memorandum of Points and Authorities attached to the Petition ("Pet. P&A") at 25-48.]

### IV.   **STANDARD OF REVIEW**

A federal court may review a habeas petition by a person in custody under a state-court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Federal habeas relief is not available for state-law errors.  Swarthout v. Cooke, 562 U.S. 216, 219, 131 S. Ct. 859, 861 (2011)(per curiam)(citing Estelle v. McGuire, 502 U.S. 62, 67, 112 S. Ct. 475 (1991)).  Even if the federal court finds a state-court error of constitutional magnitude, habeas relief is not available unless the error "had substantial and injurious effect or influence in determining the jury's verdict."  Fry v. Pliler, 551 U.S. 112, 116, 121-22, 127 S. Ct. 2321 (2007)(quoting Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S. Ct. 1710 (1993)).

Additionally, under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant habeas relief on a claim adjudicated on its merits in state court unless the adjudication:

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"Clearly established federal law" under the AEDPA means federal

law that was clearly defined by the holdings of the Supreme Court at the time of the state-court decision.  See Cullen v. Pinholster, 563 U.S. 170, 182, 131 S. Ct. 1388 (2011); Knowles v. Mirzayance, 556 U.S. 111, 122, 129 S. Ct. 1411 (2009).  Although only Supreme Court law is binding, "circuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably."  Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011); cf. Marshall v. Rodgers, 133 S. Ct. 1446, 1450 (2013)(circuit precedent may not "be used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme] Court has not announced").

In determining whether a decision is "contrary to" clearly established federal law, a reviewing court must evaluate "whether the decision 'applies a rule that contradicts [such] law' and how the decision 'confronts [the] set of facts that were before the state court.'"  Pinholster, 562 U.S. at 182 (quoting Williams v. Taylor, 529 U.S. 362, 405-06, 120 S. Ct. 1495 (2000)).  "If the state-court decision 'identifies the correct governing legal principle' in existence at the time, a federal court must assess whether the decision 'unreasonably applies that principle to the facts of the prisoner's case.'"  Id. (quoting Williams, 529 U.S. at 413).  An "unreasonable application" of law under § 2254(d)(1) is "'different from an incorrect application'" of that law.  Harrington v. Richter, 562 U.S. 86, 101, 131 S. Ct. 770, 785 (2011)(quoting Williams, 529 U.S. at 410).  "An 'unreasonable application' must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice."  White v. Woodall, 134 S. Ct. 1697, 1701 (2014)(quoting Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166 (2003)).  Similarly, a

state-court decision based on a factual determination is not "unreasonable" under § 2254(d)(2) "merely because the federal habeas court would have reached a different conclusion in the first instance." <u>Burt v. Titlow</u>, 134 S. Ct. 10, 15 (2013)(quoting <u>Wood v. Allen</u>, 558 U.S. 290, 301, 130 S. Ct. 841 (2010)).

The AEDPA reasonableness standard under § 2254(d) thus requires a high level of deference to state-court adjudications of federal claims, such that a state decision finding a claim to lack merit precludes federal habeas relief so long as "'fairminded jurists could disagree' on the correctness of the state court's decision." <u>Richter</u>, 131 S. Ct. at 786 (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664, 124 S. Ct. 2140 (2004)); <u>see also</u> <u>Titlow</u>, 134 S. Ct. at 16 ("AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court. . . .  We will not lightly conclude that a State's criminal justice system has experienced the 'extreme malfunctio[n]' for which federal habeas relief is the remedy." (quoting <u>Richter</u>, 131 S. Ct. at 786)).

Here, the California Court of Appeal adjudicated all of Petitioner's claims on the merits in a reasoned decision on direct appeal, and the California Supreme Court thereafter denied further direct or collateral review.  For purposes of AEDPA review, this Court accordingly looks to the court of appeal's opinion.  <u>See</u> <u>Stanley</u>, 633 F.3d at 859 ("We review 'the state court's last reasoned decision.'" (quoting <u>Maxwell v. Roe</u>, 606 F.3d 561, 568 (9th Cir. 2010))); <u>see also</u> <u>Cannedy v. Adams</u>, 706 F.3d 1148, 1156, 1158-59 (9th Cir. 2013), <u>amended on other grounds on denial of reh'g</u>, 733 F.3d 794, <u>cert. denied</u>, 134 S. Ct. 1001 (2014).

1
## V. <u>DISCUSSION</u>

2
## A.   CLAIM ONE: ILLEGAL SEARCH

3      In Claim One, Petitioner contends that the trial court erred in

4 denying his motion to suppress evidence seized from the motel room

5 where he and Lane were arrested.  Specifically, Petitioner argues that

6 the deputies illegally entered the room without a warrant or a valid

7 justification for searching without a warrant.  Petitioner further

8 argues that his post-arrest statement made several hours after his

9 arrest should be suppressed as fruit of that illegal search.

10 [Petition at 5; Pet. P&A at 25-34.] This claim does not a afford a

11 basis for federal habeas relief.

12      It is well-settled that, "where the State has provided an

13 opportunity for full and fair litigation of a Fourth Amendment claim,

14 a state prisoner may not be granted federal habeas corpus relief on

15 the ground that evidence obtained in an unconstitutional search or

16 seizure was introduced at his trial."  <u>Stone v. Powell</u>, 428 U.S. 465,

17 494, 96 S. Ct. 3037 (1976); <u>see also</u> <u>Newman v. Wengler</u>, 790 F.3d 876,

18 878-80 (9th Cir. 2015)(per curiam)(<u>Stone v. Powell</u> rule is not

19 abrogated by the AEDPA); <u>Moormann v. Schriro</u>, 426 F.3d 1044, 1053 (9th

20 Cir. 2005); <u>Woolery v. Arave</u>, 8 F.3d 1325, 1328 (9th Cir. 1993)

21 (characterizing <u>Stone</u> as a "categorical limitation on the

22 applicability of fourth amendment exclusionary rules in habeas corpus

23 proceedings").

24      "'The relevant inquiry is whether petitioner had the opportunity

25 to litigate his claim, not whether he did in fact do so or even

26 whether the claim was correctly decided.'" <u>Newman</u>, 790 F.3d at 880

27 (quoting <u>Ortiz-Sandoval v. Gomez</u>, 81 F.3d 891, 899 (9th Cir. 1996));

28 <u>see also</u> <u>Siripongs v. Calderon</u>, 35 F.3d 1308, 1321 (9th Cir.

16

1  1994)(petitioner's argument that "goes not to the fullness and

2  fairness of his opportunity to litigate the claim, but to the

3  correctness of the state court resolution . . . [is] irrelevant");

4  Gordon v. Duran, 895 F.2d 610, 613 (9th Cir. 1990)("Whether or not

5  [the petitioner] did in fact litigate this fourth amendment claim in

6  state court, he did have the opportunity to do so.").  Although Stone

7  does not delineate a specific test for determining whether a

8  petitioner received an opportunity for full and fair litigation of a

9  claim, relevant factors include the extent to which the merits of the

10  factual dispute were resolved in a trial court hearing and the extent

11  to which the claims were briefed and considered by the appellate

12  courts.  Terrovona v. Kincheloe, 912 F.2d 1176, 1178-79 and n.4 (9th

13  Cir. 1990)(citations omitted).

14  Prior to trial, Petitioner moved to suppress the evidence seized

15  during the allegedly unconstitutional search of the motel room,

16  pursuant to California Penal Code Section 1538.5.  [CT at 23.]  The

17  prosecution opposed the motion.  The magistrate heard the motion

18  simultaneously with the preliminary hearing.  [CT at 24.]  The

19  prosecution called Detective Alex Gilinets, who testified that Gary

20  gave the deputies permission to enter the room.  [CT at 135-36.]  Gary

21  testified as a defense witness, and denied giving the deputies

22  permission to enter the room.  [CT at 371.]  After their testimony,

23  both sides argued the motion.  [CT at 374-410.]  Ultimately, the

24  magistrate denied the motion, finding that (1) Petitioner did have a

25  sufficiently reasonable expectation of privacy in the motel room to

26  challenge the entry and search; (2) no exigent circumstances existed

27  which justified the entry and search; (3) Gary did not have actual

28  authority to consent to the entry; but (4) the deputies reasonably

1  believed that Gary had valid authority to consent, and thus that their

2  entry was valid on that ground.  [CT at 411-419.]

3       Thereafter, Petitioner moved in the trial court to set aside the

4  information pursuant to California Penal Code Section 995 on the

5  ground that the magistrate had erred in denying the suppression

6  motion.  [CT at 497-516.]  The parties agreed that no new evidence

7  would be presented on the motion, which the trial court would review

8  based on the evidence produced at the preliminary hearing, accepting

9  the magistrate's factual findings if supported by substantial

10 evidence.  [Lodg. 4 at 2.]  The trial court denied the motion, ruling

11 that Gary had actual authority to consent to the search.  [Lodg. 4 at

12 34-35.]

13      Petitioner then raised his Fourth Amendment claim on direct

14 appeal.  [Lodg. 5.]  The California Court of Appeal considered and

15 rejected the claim on the merits. [Lodg. 8 at 8-12.]  Petitioner

16 raised this claim again in his petition for review to the California

17 Supreme Court, which denied the petition.  [Lodgs. 9, 10.]  Thus,

18 Petitioner plainly had an adequate opportunity to litigate his claim

19 that the search of the motel room violated his Fourth Amendment

20 rights.  See Gordon, 895 F.2d at 613-14 (holding that, under

21 California law, a suppression hearing pursuant to California Penal

22 Code § 1538.5 provides a defendant with a full and fair opportunity to

23 litigate claims of an illegal search or seizure).  Accordingly, habeas

24 relief on this claim is barred by the rule of Stone v. Powell.

25 **B.  CLAIM TWO: BATSON ERROR**

26      In his next claim, Petitioner contends that the prosecutor

27 exercised peremptory challenges to exclude African-American jurors on

28

18

account of their race in violation of the Equal Protection Clause.[6]
[Petition at 5; Pet. P&A at 35-45.]

### 1. Background

During the selection of Petitioner's jury, the prosecutor excused
the only two African-American jurors among the prospective jury pool.
The first was Juror 7243, a twice-divorced, childless woman from
Reseda.  Juror 7243 informed the court that she was a community
college counselor and professor.  Her former spouses were a musician
and a writer.  She had previously served on a jury in a civil case
that reached a verdict.  [917-18.]  Her deceased father earned a law
degree, but never practiced, and she had extensive professional
contact with lawyers.  [Reporter's Transcript ("RT") at 934.]  Her
brother and sister-in-law were police officers.  [RT at 937.]

Juror 7243 also stated that she worked with "people who are
victimized."  [RT at 918.]  When asked to explain what that meant, she
stated:

| | |
|---|---|
| Juror 7243: | I work – I'm trained and work and [am] continuing to be trained to work with people who are traumatized by natural disasters, victimized by various aspects of our society where they're tortured or victims of crimes. |
| The Court: | Okay.  So you're sort of a victim advocate? |

---

[6] Petitioner is not African-American, but a criminal defendant
may challenge the potential race-based exclusion of jurors even if the
defendant is not a member of the excluded juror's race.  See Powers v.
Ohio, 499 U.S. 400, 402, 111 S. Ct. 1364 (1991)("[A] criminal
defendant may object to race-based exclusions of jurors effected
through peremptory challenges whether or not the defendant and the
excluded juror share the same race."); Tolbert v. Page, 182 F.3d 677,
680 n.4 (9th Cir. 1999)(en banc)(noting that Powers "abolished the
requirement that the defendant and the stricken juror share the same
race").

| | | |
|---|---|---|
| 1 | Juror 7243: | Yes. |
| 2 | The Court: | Okay.  And does that require you to appear in |
| 3 | | court on any occasion? |
| 4 | Juror 7243: | No.  It's mental health.  I work with mental |
| 5 | | health. |
| 6 | The Court: | Okay.  And do you provide counseling and |
| 7 | | direction for them? |
| 8 | Juror 7243: | Yes. That's the best way to describe it is |
| 9 | | counseling. |
| 10 | The Court: | Okay.  Do you think that work is going to |
| 11 | | prevent you from being a juror in a criminal |
| 12 | | case? |
| 13 | Juror 7243: | Probably not. |
| 14 | The Court: | Okay.  And have you been involved in |
| 15 | | counseling with families and/or individuals |
| 16 | | who may have lost someone as a result of a |
| 17 | | criminal act? |
| 18 | Juror 7243: | More in the larger scale who are victims of |
| 19 | | political government.  A larger scale such as |
| 20 | | holocaust and Vietnamese people who have come |
| 21 | | over. |
| 22 | The Court: | Okay.  Any maybe people from other countries |
| 23 | | that may have been subjected to civil war or |
| 24 | | things like that? |
| 25 | Juror 7243: | Yes.  That's exactly the description: civil war. |
| 26 | The Court: | Okay. |
| 27 | Juror 7243: | Or anything in political warfare. |
| 28 | [RT at 918-19.] | |

1        Later, the prosecutor further questioned Juror 7243 regarding her
2   work with victim counseling:

3   Prosecutor:      [Juror 7243], you said that you work with
4                    different victims of civil war and things.
5                    Are any of those people people that you
6                    classify as being victims of any regime, any
7                    political regime or military regime?
8   Juror 7243:      Yes.
9   Prosecutor:      And have you had instances where you've dealt
10                   with people that claim to have given false
11                   confessions?
12  Juror 7243:      No.
13  Prosecutor:      Anything about the fact that you're dealing
14                   with people who are victims of a military
15                   regime that you think would affect the way
16                   you would look at the police in this case?
17  Juror 7243:      I don't think so.
18  Prosecutor:      Okay.  Anything about your experience with that
19                   that might make you more sympathetic to any of the
20                   parties in this case, either the victims or the
21                   defendants?
22  Juror 7243:      I don't know.  I don't think so.
23  Prosecutor:      Okay.  You also said that you're a college
24                   [counselor]?
25  Juror 7243:      Yes.
26  Prosecutor:      Do you have any training in any kind of
27                   marriage or family counseling or therapy,
28                   anything of that nature?

| | | |
|---|---|---|
| 1 | Juror 7243: | I'm not licensed, but I – as part of my training, |
| 2 | | I did most of the course work for it.  I didn't |
| 3 | | want to practice it...  I have training in it.  I |
| 4 | | didn't complete the training for MFT because I |
| 5 | | didn't want to be a therapist. |
| 6 | Prosecutor: | Why didn't you want to be a therapist? |
| 7 | Juror 7243: | I was really young at the time and there were like |
| 8 | | issues I didn't want to deal with at that time. |
| 9 | | That was talking about 25 years ago. |
| 10 | Prosecutor: | Okay.  And is any of the counseling that you |
| 11 | | do or work that you do with victims |
| 12 | | associated with Amnesty International? |
| 13 | Juror 7243: | It's of that nature – and I have done volunteer |
| 14 | | work with people through that group, yes. |

15  [RT at 958-59.]

16       The second African-American juror, Juror 8053, was a single,

17  childless man, who was a self-employed dancer and choreographer.  [RT

18  at 980, 985.]  When initially seated, the trial court asked Juror 8053

19  if he was claiming any personal or financial hardship, and he replied

20  that he had three prepaid business trips scheduled during the trial's

21  anticipated length.  When the trial court noted that he had previously

22  postponed his jury service, Juror 8053 explained that he had tried to

23  make himself available, but "some of my work actually kind of

24  accumulate[d] through the months here, and I didn't know at the time

25  when I rescheduled it for today that I would be acquiring more work."

26  He added, "I'm not unwilling to serve, but I... want[ed] you to know."

27  [RT at 980.]

28       Juror 8053 stated that he had been previously "robbed at

gunpoint" and did not report the incident to the police.  He stated
that he was "not affected by it greatly."  [RT at 994.]  He also
reported that he had been convicted of drunk driving less than three
years before but that it would not affect his acting as a juror.  [RT
at 995.]

The prosecutor did not ask Juror 8053 any questions.[7]  However,
at sidebar, she asked the court: "I have one question.  Juror... the
one who said that he was a victim of a [robbery] at gunpoint.  Did he
say he did not report that to the police?"  The court replied, "That's
what he said."  [RT at 1006.]

Petitioner's attorney did not object when the prosecutor used her
eighth peremptory challenge to excuse Juror 7243.  However, when the
prosecutor used her twelfth peremptory to excuse Juror 8053,
Petitioner's attorney made a Wheeler motion, noting that there had
been two African-Americans on the jury panel and that the prosecutor
excused both of them "for no apparent reason."[8]  [RT at 1009.]

---

[7]   The trial court initially seated and questioned twenty-four
prospective jurors, twelve of whom were seated in the main jury box
and twelve of whom were seated in the area designated for alternate
jurors.  The attorneys had twenty minutes each for questioning.  The
prosecutor spent most of her time questioning the first twenty-four
prospective jurors.  The attorneys then exercised peremptory
challenges until only eleven prospective jurors remained.  The trial
court then seated thirteen additional jurors.  Juror 8053 was part of
this new group of thirteen prospective jurors.  By the time the
prosecutor was given a chance to question this new group, she had only
one minute left.  She asked no questions of any of the second group of
thirteen prospective jurors, which included Juror 8053.  [See RT at
1005.]

[8]   Petitioner challenged the prosecutor's exercise of peremptory
challenges pursuant to People v. Wheeler, 22 Cal.3d 258 (1978).  In
California, a Wheeler motion is the procedural equivalent of a
Batson challenge.   See Crittenden v. Ayers (Crittenden I), 624 F.3d
943, 951 n.2 (9th Cir. 2010)(noting that the Ninth Circuit considers
Wheeler "the procedural equivalent" of Batson, and hence, "a Wheeler
(continued...)

The trial court stated that it would not require the prosecutor to explain her reasons for excusing Juror 7243, but it would do so as to Juror 8053.  The prosecutor explained:

> I'm bothered by the fact that he had a – he was a victim of a robbery at gunpoint and did not report it to the police.  I would have inquired further, but I only have one minute left for all of the jurors.
>
> I think for that reason alone.  I asked a few questions about it, and I felt that made him very uncomfortable.  So on that basis alone I have excused him.

[RT at 1010.]

The trial court then denied Petitioner's motion, stating: "I will accept the explanation as to the exercise of the second [peremptory challenge]."  The court reiterated that it was "not requiring the explanation as to the first."  Id.  The trial court did not further explain its ruling.

### 2.   California Court of Appeal Opinion

Petitioner raised his Wheeler/Batson claim in the California Court of Appeal on direct review. With respect to Juror 8053, the state appellate court denied the claim, noting that Petitioner made a prima facie case of purposeful discrimination, but that the prosecutor gave a valid race-neutral explanation for the challenge. Specifically, the court stated:

> [The trial court] impliedly found [Petitioner] had made a sufficient prima facie case regarding [Juror 8053] by

---

[8]  (...continued)
motion serves as an implicit Batson objection"); see also Ngo v. Giurbino, 651 F.3d 1112, 1116 (9th Cir. 2011)(describing Wheeler as "the California counterpart" to Batson).

1    requiring the prosecutor to explain that challenge.  The

2    prosecutor offered a race-neutral explanation for the

3    challenge: the juror's being the victim of a robbery at

4    gunpoint yet failing to report the crime to the police.  The

5    court impliedly found that explanation credible and not a

6    pretext when it denied [Petitioner's] motion without further

7    explanation.  We reject [Petitioner's] argument that the

8    court thereby erred.  The prosecutor gave a valid race-

9    neutral explanation for excusing the juror.  (<u>People v.</u>

10   <u>Box</u> (2000) 23 Cal. 4th 1153, 1189.)  Moreover, although the

11   prosecutor did not question [Juror 8053], she specifically

12   asked the court to verify his statement regarding failure to

13   report being the victim of a crime, demonstrating that the

14   response was important to her.  Given the time limits on her

15   ability to directly question jurors, that inquiry supports

16   the court's implied finding that the stated reason was

17   sincere and thus valid...  In addition, there was no racial

18   issue in this case, where the victim, both defendants, and

19   most of the primary witnesses all were Caucasian.  The

20   absence of a racial issue further supports the court's

21   conclusion that the stated ground for excusing the juror was

22   not a pretext for discrimination.

23       [Petitioner] also argues that because the prosecutor

24   accepted another juror who failed to report a crime, her

25   excusing an African-American juror on this ground implies

26   that the stated reason for the challenge was a pretext for

27   discrimination.  We disagree.  Although comparative juror

28   analysis now appears to be proper in California as a basis

25

1      for evaluating a stated reason for a peremptory challenge...

2      the two jurors were not similarly situated.  The comparison

3      juror reported that his sister, not the juror, was a

4      domestic violence victim.  Moreover, unlike the excused

5      juror, the comparison juror had not been convicted of a

6      crime and did not state that serving on the jury would be a

7      financial hardship.  Thus, comparative juror analysis does

8      not aid [Petitioner].

9 [Lodg. 8 at 16-17 (citations omitted).]

10    With respect to Juror 7243, the California Court of Appeal noted

11 that the trial court did not find a prima facie case of discrimination

12 and thus did not require the prosecutor to state her reasons for

13 excusing this juror.  The appellate court determined that the trial

14 court's finding was proper because the record suggested grounds upon

15 which the prosecutor might reasonably have excused the juror.

16 Specifically, the court of appeal stated:

17      As to [Juror 7243], although the record does not

18      contain the prosecutor's reasons for excusing her, we

19      nonetheless find the court did not err in denying

20      [Petitioner's] motion.  "'[W]hen a trial court denies a

21      Wheeler motion without finding a prima facie case of group

22      bias the reviewing court considers the entire record of voir

23      dire.  As with other findings of fact, we examine the record

24      for evidence to support the trial court's ruling.  Because

25      Wheeler motions call upon trial judges' personal

26      observations, we view their rulings with 'considerable

27      deference' on appeal. If the record 'suggests grounds upon

28      which the prosecutor might reasonably have challenged' the

26

1    jurors in question, we affirm.'"

2         The prosecutor questioned [Juror 7243] about her

3    training as a therapist and her work as a counselor for

4    victims of government oppression, factors which may have

5    suggested potential sympathy for [Petitioner] as a young,

6    impoverished street person under the influence of Itaev, an

7    older and criminally-inclined codefendant, and antipathy

8    toward the prosecution.  Those factors properly would

9    support a peremptory challenge. The court's express refusal

10   to require the prosecutor to explain excusing [Juror 7243]

11   under these circumstances strongly suggests that the court

12   considered the challenge so obviously proper that no inquiry

13   was called for.  Because the overall record in this case

14   demonstrates that this peremptory challenge was for a non-

15   discriminatory purpose, no remand is necessary to explore

16   the reasons.

17   [Lodg. 8 at 17 (citations omitted).]

18        **3.   Evidentiary Hearing**

19        On federal habeas review, this Court found that Petitioner had

20   raised a colorable claim that the state court's adjudication of his

21   Batson claim with respect to Juror 7243 was either contrary to or an

22   unreasonable application of clearly established federal law.  See 28

23   U.S.C. § 2254(d)(1).  Accordingly, on September 28, 2012, the Court

24   held an evidentiary hearing in order to further develop the factual

25   record as to this claim.

26        The prosecutor was the sole witness at the evidentiary hearing.

27   She testified that she had "no independent recollection of anything

28   relating to jury selection in [Petitioner's] case," and that the

transcript and her own notes from jury selection did not refresh her memory. [Reporter's Transcript from Evidentiary Hearing ("RTEH") at 9, 12, 21, 26, 51, 78.]  When asked why she excused Juror 7243, she explained that, although she did not remember her actual reasons, she had an opinion of why she may had done so from reviewing her notes and the transcript:

> This particular juror worked as a victim's advocate but it was not victims of crime per se, not in the criminal justice system.  These were victims of – if I understood her correctly, among – among other things, of government, of government regimes and things of that nature.  And additionally, she stated that she did some – a form of mental health counseling in relationship to those victims.

[RTEH at 26.]  The prosecutor further noted that the prosecution's case was based partially on a confession, and she "would be very concerned as to how [such a] juror would view a confession."  [RTEH at 27.]  Later, when Respondent's counsel asked her how she would "feel about a potential juror having worked... with Amnesty International," the prosecutor replied:

> I would feel very uncomfortable keeping a juror like that on any trial, but specifically a trial involving a confession.  I would never keep someone with – with that information...
>
> [M]y impression of people who work with Amnesty International is that they are very distrustful of government and especially of government – anything having to do with prisoners or how prisoners are treated and, you know, just that they are very suspect of the government and

1   are – are very protective, for lack of a better word, of
2   people who they perceive are being in any way disadvantaged
3   by the government.

4   [RTEH at 57-58.]  The prosecutor stated her belief that someone with
5   connections to Amnesty International "might be more inclined to think
6   that a confession was coerced or shouldn't be believed for some other
7   reason."  [RTEH at 58.]  She further stated:

8         I think if I were to ask a fellow DA, if I had had the
9         opportunity, "Hey, I have somebody on a jury who has got an
10        association with Amnesty International and/or a similar
11        group," I think any DA would suggest exercising a peremptory
12        against such a prospective juror.

13  [RTEH at 62.]

14  **4.   Applicable Federal Law**

15        In Batson, the Supreme Court established that "the State's
16  privilege to strike individual jurors through peremptory challenges []
17  is subject to the commands of the Equal Protection Clause."  Batson,
18  476 U.S. at 89.  Specifically, "the Equal Protection Clause forbids
19  the prosecutor to challenge potential jurors solely on account of
20  their race or on the assumption that [members of a particular racial]
21  group will be unable impartially to consider the State's case against
22  [the] defendant."  Id.; see also Cook v. LaMarque, 593 F.3d 810, 815
23  (9th Cir. 2010)("purposeful discrimination" prohibited by Batson is
24  shown "if race was a substantial motivating factor in peremptory
25  challenge").[9]  Peremptory challenges based on race are prohibited even

26
27        [9]  "'[T]he Constitution forbids striking even a single
    prospective juror for a discriminatory purpose.'"  Snyder v.
28                                                    (continued...)

1  if, as in this case, the defendant is of a different race than the

2  juror being struck.  Powers v. Ohio, 499 U.S. at 402.

3      Under Batson and its progeny, courts employ a three-step process

4  when "assessing a claim of purposeful discrimination . . . [by the

5  prosecutor] in jury selection."  Miller-El v. Dretke (Miller-El II),

6  545 U.S. 231, 239, 125 S. Ct. 2317 (2005); accord Johnson v.

7  California, 545 U.S. 162, 168, 125 S. Ct. 2410 (2005); Purkett v.

8  Elem, 514 U.S. 765, 767-68, 115 S. Ct. 1769 (1995); Shirley v. Yates,

9  807 F.3d 1090, 1095 (9th Cir. 2015).  First, the defendant must make a

10  prima facie showing that the prosecution challenged a prospective

11  juror on an impermissible ground such as race.  Johnson, 545 U.S. at

12  168; Batson, 476 U.S. at 93-94.  "[A] prima facie case of purposeful

13  discrimination [may be made out] by showing that the totality of the

14  relevant facts gives rise to an inference of discriminatory purpose."

15  Batson, 476 U.S. at 93-94; see also Shirley, 807 F.3d at 1101 ("[A]

16  defendant makes out a prima facie case if he produces evidence

17  sufficient to support a 'reasonable inference' of discrimination."

18  (citing Johnson, 545 U.S. at 166-67, 169-73)).

19      Second, if a prima facie showing is made, the burden shifts to

20  the prosecution to articulate a race-neutral explanation for the

21  challenge.  Batson, 476 U.S. at 97.  "[T]he prosecutor [may not] rebut

22  the defendant's case merely by denying that he had a discriminatory

23  motive or affirming his good faith in making individual selections . .

24  . [but] must articulate a neutral explanation related to the

25  _____

26  [9]   (...continued)

  Louisiana, 552 U.S. 472, 478, 128 S. Ct. 1203 (2008)(quoting United

27  States v. Vasquez-Lopez, 22 F.3d 900, 902 (9th Cir. 1994); Gonzalez v.

  Brown, 585 F.3d 1202, 1206 (9th Cir. 2009)("A single peremptory

28  strike, if purposefully discriminative, will be enough to upset a jury

  conviction.").

particular case to be tried." Id. at 98 (internal quotation marks, brackets and citations omitted); accord Rice v. Collins, 546 U.S. 333, 338, 126 S. Ct. 969 (2006)("Although the prosecutor must present a comprehensible reason, '[t]he second step of this process does not demand an explanation that is persuasive, or even plausible'; so long as the reason is not inherently discriminatory, it suffices." (quoting Purkett, 514 U.S. at 767-68)).

Third, if a race-neutral explanation is offered, the court must determine "if the defendant has established purposeful discrimination." Batson, 476 U.S. at 98.  "This final step involves evaluating 'the persuasiveness of the justification' proffered by the prosecutor, but 'the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.'" Rice, 546 U.S. at 338 (quoting Purkett, 514 U.S. at 768); see also Shirley, 807 F.3d at 1107 ("[A] defendant opposing a peremptory challenge bears the ultimate burden of proving the challenge was improper[.]; he must carry this burden by a preponderance of the evidence." (citing Paulino v. Harrison (Paulino II), 542 U.S. F.3d 692, 702 (9th Cir. 2008); Yee v. Duncan, 463 F.3d 893, 899 (9th Cir. 2006))).

### 5.  Juror 8053

#### a.  Steps One and Two

With respect to Juror 8053, the trial court found that Petitioner had made a prima facie showing of purposeful discrimination at step one of the Batson analysis, and, therefore, proceeded to step two, requiring the prosecutor to provide an explanation for excusing this

juror.[10]  [See RT at 1009-10.]  The prosecutor stated that she
challenged Juror 8053 because he failed to report to the police that
he was a victim of an armed robbery, and that she had no opportunity
to further inquire regarding his reasons for not reporting the crime.
[RT at 1010.]  The trial court and the California Court of Appeal
properly accepted the prosecutor's explanation for striking Juror 8053
as a legitimate, race-neutral reason to satisfy Batson's step two.
[See RT at 1010; Lodg. 8 at 16-17]; see generally Portillo v. Biter,
2015 WL 4272906, at *5-6 (C.D. Cal. May 21, 2015)(where prosecutor
excused juror because he did not report crimes to the police); Nunez
v. Bitter, 2015 WL 3452604, at *9-10 (C.D. Cal. Feb. 26, 2015)(finding
prosecutor's reason to be race-neutral where the prosecutor "made a
tactical decision to not select a juror who had been the victim of a
violent crime that he failed to report to the authorities...") ;
Anderson v. Administrator of Northern State Prison, 2014 WL 6675905,
at *8 n.7 (D.N.J. Nov. 24, 2014)(prosecutor excused juror because of
juror's failure to report a serious crime committed against him);
Marrero v. Lamas, 2012 WL 2938438, at *5-6 (E.D. Pa. June 25,
2012)(prosecutor was justified in excusing juror because she and her
father had been robbery victims and did not report the crimes to the
police).

_____

   [10]   To the extent Petitioner is arguing that the state courts
applied the incorrect standard in determining whether Petitioner made
a prima facie case at step one of the Batson inquiry, the Court need
not reach this issue with respect to Juror 8053.  Where the
"prosecutor has offered a race-neutral explanation for the peremptory
challenges and the trial court has ruled on the ultimate question of
intentional discrimination, the preliminary issue of whether the
defendant had made a prima facie showing becomes moot."  Hernandez v.
New York, 500 U.S. 352, 359, 111 S. Ct. 1859 (1991).

### b.   Step Three – Purposeful Discrimination

Step three of the <u>Batson</u> analysis involves an evaluation of the prosecutor's credibility.  <u>Snyder v. Louisiana</u>, 552 U.S. 472, 477, 128 S. Ct. 1203 (2008).  "[T]he decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed."  <u>Hernandez v. New York</u>, 500 U.S. at 365. Credibility can be measured by, among other factors, the prosecutor's demeanor, the reasonableness of the explanation, and the nexus between the explanation and accepted trial strategies.  <u>Miller-El v. Cockrell</u> (<u>Miller-El I</u>), 537 U.S. 322, 339–40, 123 S. Ct. 1029 (2003); <u>see also</u> <u>Hernandez</u>, 500 U.S. at 365 (demeanor of attorney who exercises challenge often will be best evidence of discriminatory intent); <u>Mitleider v. Hall</u>, 391 F.3d 1039, 1047 (9th Cir. 2004)("[T]he trial court must evaluate the prosecutor's proffered reasons and credibility under the totality of relevant facts, using all the available tools including its own observations and the assistance of counsel." (citation omitted)).

Under the AEDPA, a federal habeas court may grant relief only if it was unreasonable for the state courts "to credit the prosecutor's race-neutral explanations for the <u>Batson</u> challenge."  <u>Rice</u>, 546 U.S. at 338 (citing 28 U.S.C. § 2254(d)(2)).  Because a trial court's finding on purposeful discrimination rests largely on credibility, the federal habeas court must apply a "doubly deferential" standard.  "One level of deference arises from the broad power of a trial court to assess credibility of the prosecutor's statements that were made in open court.  Another level of deference arises from the AEDPA context where we defer to state court decisions that are not objectively unreasonable."  <u>Aleman v. Uribe, Jr.</u>, 723 F.3d 976, 983 (9th Cir.

2013)(citing <u>Briggs v. Grounds</u>, 682 F.3d 1165, 1170 (9th Cir. 2012)("Here our standard is doubly deferential: unless the state appellate court was objectively unreasonable in concluding that a trial court's credibility determination was supported by substantial evidence, we must uphold it.")).

Under this doubly deferential standard, this Court cannot say that it was objectively unreasonable for the California Court of Appeal to affirm the trial court's <u>Batson</u> ruling with respect to Juror 8053.  The record in this case supports the prosecutor's stated reason for excusing Juror 8053 and does not reflect that it was pretextual. During voir dire, Juror 8053 stated that he had been robbed at gunpoint, but he was "not affected by it greatly" and did not report the crime to the police.  [RT at 994.]  Although the prosecutor did not question Juror 8053, she specifically asked the trial court to verify Juror 8053's statement regarding his failure to report being the victim of a crime.  [RT at 1006.]  As the California Court of Appeal noted, the prosecutor's question "demonstrat[es] that the response was important to her," and "[g]iven the time limits on her ability to directly question jurors, that inquiry supports the court's implied finding that the stated reason was sincere and thus valid." [Lodg. 8 at 16]; <u>cf.</u> <u>Miller-El II</u>, 545 U.S. at 246 (prosecutor's failure to address a subject of purported concern at voir dire raises doubt as to the sincerity of that reason for excusing juror)

Furthermore, race and race discrimination were not at issue in this case, and the stricken jurors were not of the same race as Petitioner.  These factors also reasonably weigh against a finding of intentional discrimination.  <u>See</u> <u>Pese v. Runnels</u>, 2009 WL 248374, at *8 (N.D. Cal. Jan. 29, 2009); <u>see also</u> <u>Johnson v. Campbell</u>, 92 F.3d

951, 953-54 (9th Cir. 1996)(insufficient prima facie case for exclusion based on sexual orientation where neither sexual orientation nor other discrimination was at issue in case and there were neutral reasons for challenge).

Finally, a comparison of Juror 8053 with empaneled jurors does not suggest that the prosecutor's reason for striking him was pretextual. "[A] comparative juror analysis is an important means for federal courts to review a trial court's ruling in a Batson challenge." Murray v. Schriro, 745 F.3d 984, 1005 (9th Cir. 2014) (comparative juror analysis is used to review the reasonableness of the factual determinations underlying the state court's decision); see also Kesser v. Cambra, 465 F.3d 351, 360-61 (9th Cir. 2006)(court must conduct a comparative juror analysis to determine whether the basis upon which a prosecutor challenged a disputed juror is a pretext). "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step." Miller-El II, 545 U.S. at 241. A "side-by-side comparison" is made of the juror who was stricken from the panel with others allowed to serve. Id. For a comparative analysis to be useful, the compared jurors must be similarly situated. See Green v. LaMarque, 532 F.3d 1028, 1033 (9th Cir. 2008); Mitleider, 391 F.3d at 1049 n.9.

Here, as he did on direct appeal, Petitioner argues that because the prosecutor accepted another juror who failed to report a crime, her excusing an African-American on this ground implies that the stated reason for the challenge was a pretext for discrimination. [See Pet.'s Post-Evid. Brief at 17.] However, as the state appellate

35

1  court reasonably concluded, Juror 8578 was not similarly situated to

2  Juror 8053 so as to show purposeful discrimination.  Juror 8578

3  reported that his sister, not the juror himself, had been a victim of

4  domestic violence at the hands of their brother.  [RT at 1032;

5  see also RT at 1039-40.]  Therefore, comparative juror analysis does

6  not aid Petitioner in this case.  See Jamerson v. Runnels, 713 F.3d

7  1218, 1231 (9th Cir. 2013)(The prosecutor's "failure to exercise

8  peremptory strikes against other non-black jurors who shared weak

9  parallels with [the struck] juror... ultimately does little to

10  undermine the stated justification."); Aleman, 723 F.3d at 983

11  ("Although these other jurors bears some similarity to [the struck

12  juror], the record does not show that they were so similar as to

13  compel the conclusion that the state court erred in concluding that

14  the prosecutor did not purposefully discriminate."); Burks v. Borg, 27

15  F.3d 1424, 1429-30 (9th Cir. 1994)(sustaining the state court's

16  decision where the objective evidence of discrimination was relatively

17  weak).[11]

18      In sum, the record does not establish that the state courts were

19  objectively unreasonable in concluding that the prosecution's

20  _____

21      [11]  The Court notes that Juror 4736 was also held up at gunpoint.
It is unclear from the record whether this crime was ever reported,
and the prosecutor did not question the juror on the subject.  [See RT
22  at 661.]  However, Juror 4736 was excused by defense counsel prior to
the prosecutor's acceptance of the jury and, therefore, could not be
23  properly considered in the comparative juror analysis.  See Mayes v.
Premo, 766 F.3d 949, 961-62 (9th Cir. 2014)(prosecutor's failure to
24  strike a comparable juror did not suggest discrimination when the
juror was stricken by the defense at a time when the prosecutor had
25  not yet accepted the jury and had not exercised all his peremptory
challenges).  Moreover, unlike Juror 8053, Juror 4736 had been a
26  witness in a criminal trial, and, when discussing his experience, he
made several comments that appeared to be unfavorable to the defense.
27  Specifically, he appeared to criticize one of the prosecutors in that
case as "nonchalant," and favorably describe another prosecutor as "a
28  lot more stern" and "firm."  [See RT at 962-64.]

1  race-neutral explanation with respect to Juror 8053 was credible and

2  that the challenge to this juror was not the product of purposeful

3  discrimination.  Accordingly, Petitioner is not entitled to habeas

4  relief on this aspect of his Batson claim.

5      **6.   Juror 7243**

6      Petitioner further contends that the trial court erred in denying

7  his Wheeler/Batson motion with respect to Juror 7243.  As discussed

8  below, this claim also fails to establish grounds for federal habeas

9  relief.

10         **a.   Standard of Review**

11     The California Court of Appeal affirmed the trial court's finding

12  that Petitioner did not show a prima facie case of discrimination with

13  respect to Juror 7243.  Normally, this Court would be required to

14  defer to the state appellate court's finding that there was no prima

15  facie showing of bias.  See Paulino v. Castro (Paulino I), 371 F.3d

16  1083, 1090 (9th Cir. 2004); see also Crittenden v. Chappell

17  (Crittenden II), 804 F. 3d 998, 1006 (9th Cir. 2015)("At Batson's

18  first step, whether the defendant has made a prima facie showing is a

19  mixed question of law and fact accorded a presumption of correctness

20  in the habeas context." (citation omitted)). However, in affirming the

21  trial court's step one Batson/Wheeler ruling in this case, it appears

22  that the court of appeal erroneously applied a standard imposing on

23  the defendant "a more onerous burden of proof than is permitted by

24  Batson's standard of raising an inference of discriminatory purpose."

25  Crittenden I, 624 F.3d at 954 (citations omitted); see Johnson v.

26  California, 545 U.S. at 173 ("California's 'more likely than not'

27  standard is at odds with the prima facie inquiry mandated by

28  Batson."); Shirley, 807 F.3d at 1101 (Johnson v, California "held that

1   the California Supreme Court had been wrong to require <u>Batson</u>

2   claimants to show a 'strong likelihood' of discrimination at Step

3   One") Under this circumstance, the state court adjudication is not

4   entitled to AEDPA deference, and this Court properly conducts de novo

5   review of Petitioner's <u>Batson</u> claim regarding Juror 7243. <u>See</u> <u>Shirley</u>,

6   807 F.3d at 1101; <u>Crittenden II</u>, 804 F.3d at 1010 (citing <u>Crittenden</u>

7   <u>I</u>, 624 F.3d at 954); <u>Johnson v. Finn</u>, 665 F.3d 1063, 1068-69 (9th Cir.

8   2011); <u>Wade v. Terhune</u>, 202 F.3d 1190, 1197 (9th Cir. 2000)..[12]

9

10      [12]   Respondent argues that the California Court of Appeal
"employed the correct legal standard" in evaluating Petitioner's

11   <u>Batson</u> claim, and therefore this Court should review the claim under
the deferential AEDPA standard. [Resp.'s Post-Evid. Brief at 5-6.]

12   Here, although the state appellate court's decision cited and
acknowledged the correct standard – i.e., that "the complaining party

13   need only produce evidence sufficient to raise an inference of
impermissible group bias" at step one (citing <u>Johnson</u>

14   <u>v. California</u>)] – it appears from the court's further reasoning that
it then <u>applied</u> a more onerous standard.  Specifically, the court

15   stated and followed the California rule that "'[w]hen a trial court
denies a <u>Wheeler</u> motion without finding a prima facie case of group

16   bias,'" the reviewing court must affirm "[i]f the record 'suggests
grounds upon which the prosecutor might reasonably have challenged'

17   the jurors in question."  [Lodg. 8 at 17 (citing <u>People v. Mayfield</u>,
14 Cal. 4th 668, 723 (1997)(applying California's "strong likelihood"

18   standard)).]  The Ninth Circuit has held that this rule reflects an
"improper[] heightening" of the correct <u>Batson</u> "reasonable inference"

19   standard, because "the existence of 'grounds upon which a prosecutor
could reasonably have premised a challenge,' does not suffice to

20   defeat an inference of racial bias at the first step of the <u>Batson</u>
framework." <u>Johnson v. Finn</u>, 665 F.3d at 1069-70 (observing that

21   although the state appellate court in that case had recited the
correct standard, its reasoning left "little doubt" that it applied

22   the incorrect "strong likelihood" standard). <u>See</u> <u>also</u> <u>Shirley</u>, 807
F.3d at 1101 (holding that state court decisions applying step one

23   standard identical to that articulated by court of appeal in this case
"do not warrant deference under AEDPA, because they are 'contrary to .

24   . . clearly established Federal law" (citing 28 U.S.C. § 2254(d)(1);
<u>Johnson v. Finn</u>, 665 F.3d at 1069)).

25      In any event, even if Respondent were correct in contending that
AEDPA deference is appropriate in this case, it is nevertheless

26   permissible for this Court to review Petitioner's <u>Batson</u> claim de novo
because, as discussed below, the claim ultimately fails to merit

27   federal habeas relief under that standard.  <u>See</u> <u>Berghuis v. Thompkins</u>,
560 U.S. 370, 390, 130 S. Ct. 2250 (2010)(when it is unclear whether

28                                    (continued...)

1
### b.   Step One – Prima Facie Case

2      Applying a de novo standard, the Court finds that Petitioner has

3 met his prima facie burden at step one of the <u>Batson</u> analysis.  At

4 the first step of the <u>Batson</u> analysis, Petitioner "must show that (1)

5 the prospective juror is a member of a 'cognizable racial group,' (2)

6 the prosecutor used a peremptory strike to remove the juror, and (3)

7 the totality of the circumstances raises an inference that the strike

8 was motivated by race."  <u>Boyd v. Newland</u>, 467 F.3d 1139, 1143 (9th

9 Cir. 2006).  Here, it is undisputed that Juror 7243 was a member of a

10 "cognizable racial group" and was stricken from the jury panel by the

11 prosecutor.  <u>Id.</u>  Thus, the only question is whether the third element

12 is met, namely whether the totality of the circumstances raises an

13 inference that the prosecutor challenged the juror based on race.

14 <u>Johnson v. California</u>, 545 U.S. at 168.

15      In evaluating whether a petitioner has established a prima facie

16 case, a reviewing court should consider the "'totality of the relevant

17 facts' and 'all relevant circumstances' surrounding the peremptory

18 strike."  <u>Boyd</u>, 467 F.3d at 1146 (quoting <u>Batson</u>, 476 U.S. at 94, 96).

19 The Supreme Court has made clear that it "did not intend the first

20 step to be so onerous that a defendant would have to persuade the

21 judge – on the basis of all the facts, some of which are impossible

22 for the defendant to know with certainty – that the challenge was more

23 likely than not the product of purposeful discrimination."  <u>Johnson</u>,

24 545 U.S. at 170.  Rather, a defendant satisfies the requirements of

25 <u>Batson</u>'s first step "by producing evidence sufficient to permit the

26

27      [12]  (...continued)
state court used incorrect legal standard and whether AEDPA deference
28 applies, federal court may engage in de novo review and deny writ of
habeas corpus on that basis)(citing 28 USC § 2254(a)).

1  trial judge to draw an inference that discrimination has occurred."
2  Id.; see also Johnson v. Finn, 665 F.3d at 1070-71; Williams v.
3  Runnels, 432 F.3d 1102, 1106 (9th Cir. 2006).

4      In this case, the prosecutor excused the only two African-
5  American prospective jurors from the jury pool.  "Two challenges out
6  of two venirepersons are not always enough to establish a prima facie
7  case.  Because the numbers are so small (and, hence, potentially
8  unreliable), two such challenges, standing alone, may not be
9  sufficient to support an inference of discrimination."  Fernandez v.
10 Roe, 286 F.3d 1073, 1079 (9th Cir. 2002); see also Williams v.
11 Woodford, 384 F.3d 567, 583-84 (9th Cir. 2004)(standing alone, showing
12 that prosecutor used two of nineteen challenges to remove the only two
13 African-American females on the jury and used one of three challenges
14 to remove a male African-American alternate was not enough to
15 establish a prima facie case under Batson); cf. Shirley, 807 F.3d at
16 1101 (finding a prima facie case of discrimination where prosecutor
17 struck two out of three African American jurors and stating "[t]he
18 fact that a prosecutor peremptorily strikes all or most veniremembers
19 of the defendant's race – as was the case here – is often sufficient
20 on its own to make a prima facie case at Step One.").

21     In this case, however, the two challenges against African-
22 Americans do not stand alone.  Under Batson, the Court "must consider
23 'all relevant circumstances' surrounding the challenges."  Fernandez,
24 286 F.3d at 1079 (citing Batson, 476 U.S. at 96-97); Johnson v. Finn,
25 665 F.3d at 1071.  Although the trial court did not find a prima facie
26 case as to Juror 7243, it did find a prima facie case as to Juror
27 8053, and, thus, an inference that discrimination had occurred.
28 Furthermore, the record reflects that the trial court had earlier

found that the prosecutor's use of peremptory challenges in the

selection of Petitioner's co-defendant Itaev's jury gave rise to a

prima facie case of purposeful discrimination.[13]   [RT at 398.]

Although the trial court accepted the prosecutor's explanation in that

instance, it admonished the prosecutor that "if you exercise another

peremptory that doesn't have a justification based on what I believe

to be ethnicity or race, then we will conduct a complete hearing."

[RT at 399.]   These circumstances – specifically, the trial court's

finding of a prima facie case as to Juror 8053, its prior finding of a

prima facie case in the selection of Itaev's jury, and its explicit

warning to the prosecutor against striking any more African-Americans

– support an inference of racial discrimination here.   See Fernandez,

286 F.3d at 1078-79 ("Given these circumstances – that the

prosecutor's behavior had already supported an inference of

discrimination and that the trial court had expressly warned him

against striking any more Hispanics – the prosecutor's subsequent

strikes against the only two African-American venirepersons also

---

[13]   As previously noted, Petitioner and his codefendant were
tried at a joint trial before separate juries, with Itaev's jury
selected prior to Petitioner's jury. Because the selection processes
for the two juries were part of the same trial proceeding, the Court
finds it reasonable and proper to admit and consider evidence
regarding the Itaev jury in assessing the totality of relevant
circumstances surrounding the selection of Petitioner's jury.
Respondent's objection in this regard should accordingly be overruled.
The record reflects that, during the selection of Itaev's jury,
defense counsel for Itaev made a Wheeler/Batson motion when the
prosecutor excused Juror 1245, an African-American female who worked
as a postal clerk.   The trial court denied the motion, finding no
prima facie case. [RT at 37, 362-63.]   Itaev's attorney raised another
Wheeler/Batson motion when the prosecutor subsequently excused Juror
8493, an African-American male who had previously sat on a criminal
jury that was unable to reach a verdict. [RT at 370-71, 398.]   This
time, the trial court required justification for the strike.   The
prosecutor explained that she excused him because he had previously
"sat on a hung jury," and the trial judge accepted the explanation.
[RT at 398-99.]

1   support an inference of racial discrimination.").

2       In light of the foregoing, the Court finds that Petitioner has

3   established a prima facie showing of racial discrimination under

4   Batson with respect to Juror 7043.[14]   See United States v. Chinchilla,

5   874 F.2d 695, 698 n.5 (9th Cir. 1989) ("[A]lthough the striking of one

6   or two members of the same racial group may not always constitute a

7   prima facie case, it is preferable for the court to err on the side of

8   the defendant's rights to a fair and impartial jury.").

9           **c.    Step Two – The Prosecutor's Explanation**

10      At the second step of the Batson analysis, "the issue is the

11  facial validity of the prosecutor's explanation." Hernandez, 500 U.S.

12  at 360.  "[A] neutral explanation in the context of [the] analysis

13  here means an explanation based on something other than the race of

14  the juror." Id.  The government's burden of production at step two is

15  relatively low; "[u]nless a discriminatory intent is inherent in the

16  prosecutor's explanation, the reason offered will be deemed

17  race-neutral." Purkett, 514 U.S. at 768.  Moreover, although the

18  prosecutor must present a comprehensible reason, "[t]he second step of

19

20      [14]  In arguing that Petitioner failed to establish a prima facie
21  case, Respondent points to the fact that there was "no cross-racial
    component" to this case and to the fact that two African-American
    jurors were seated on Itaev's jury. [Resp.'s Post-Evid. Brief at 6-
22  7.]  But, as noted above, a criminal defendant may challenge the
    potential race-based exclusion of jurors even if the defendant is not
23  a member of the excluded juror's race.  See Powers v. Ohio, 499 U.S.
    at 402; Tolbert v. Page, 182 F.3d at 680 n.4.  Furthermore, the fact
24  that two African-Americans remained on Itaev's jury is not
    dispositive.  See Fernandez, 286 F.3d at 1079 ("That one Hispanic
25  juror remained on the jury, though helpful to the State, is not
    dispositive."); Turner v. Marshall, 63 F.3d 807, 814 (1995)("In
26  denying a Batson motion,... a trial court may not rely solely on the
    fact that some African-Americans remain on the jury."), overruled on
27  other grounds, Tolbert, 182 F.3d at 685. This is particularly true
    here where the trial court explicitly warned the prosecutor regarding
28  any additional challenges against African-Americans.  [RT at 399.]

1   this process does not demand an explanation that is persuasive, or

2   even plausible"; so long as the reason is not inherently

3   discriminatory, it suffices.  Id. at 767-68; Kesser v. Cambra, 465

4   F.3d at 359 ("[T]o accept a prosecutor's stated nonracial reasons, the

5   court need not agree with them.").

6       At the evidentiary hearing, the prosecutor testified that she

7   could not recollect her reasons for excusing Juror 7043.  However,

8   after reviewing her notes and the transcript of voir dire, she had an

9   opinion as to why she did.  Specifically, she believed she excused

10  Juror 7243 because Juror 7243 worked for Amnesty International and

11  also as an advocate for victims of "government regimes and things of

12  that nature."  [RTEH at 26-27, 57-58.]  Removing a juror based on her

13  occupation or work with a group such as Amnesty International

14  constitutes a race-neutral reason sufficient to satisfy Batson's step

15  two.  See, e.g., Cook v. Lamarque, 593 F.3d at 818 (9th Cir. 2010)

16  ("[A] juror's occupation is generally a legitimate reason for a

17  peremptory challenge."); Jamerson, 713 F.3d at 1235 ("A prosecutor may

18  strike a potential juror on the basis of his or her occupation if the

19  prosecutor can state a genuine, race-neutral reason for believing that

20  the occupation would make the juror unfavorable."); United States v.

21  Thompson, 827 F.2d 1254, 1260 (9th Cir. 1987)("Excluding jurors

22  because of their profession... is wholly within the prosecutor's

23  prerogative."); Polk v. Dickinson, 570 Fed. Appx. 691 (9th Cir.

24  2014)(Prosecutor struck juror in part because of his involvement with

25  Amnesty International.  "He explained that he generally found members

26  of such rights-oriented organizations more likely to 'identify or

27  sympathize with the defense.'").

28      Petitioner argues that because the prosecutor had no independent

recollection of her reasons for striking Juror 7243, her testimony at the evidentiary hearing amounted to mere speculation, which is not enough to satisfy the state's burden of production at step two. [See Pet.'s Post-Evid. Brief at 10-12.] However, this argument has been rejected by the Ninth Circuit.  See Shirley, 807 F.3d at 1105 (holding that where prosecutor has no actual memory of reasons for strike, but testifies based on review of transcript and general jury selection approach that race-neutral reason was in fact the basis for exercise of peremptory, "such circumstantial evidence is sufficient for the limited purpose of Step Two"); Crittenden I, 624 F.3d at 957 (where "time has passed and the prosecutor no longer has a present recollection of [her] reasons for striking the juror, the state may offer an explanation based on circumstantial evidence"); Paulino II, 542 F.3d at 700 ("Evidence of a prosecutor's actual reasons may be direct or circumstantial, but mere speculation is insufficient."); see also Harris v. Haeberlin, 752 F.3d 1054, 1059 (6th Cir. 2014)(holding that a prosecutor's lack of an independent recollection about the reasons for her peremptory strike "is not fatal to the prosecution's ability to articulate a race-neutral justification for the strike at Batson's second step").  "When this occurs, we say that the state has 'reconstructed' the prosecutor's reasons for striking the juror." Crittenden I, 624 F.3d at 958.  "During reconstruction, the state may rely on any relevant evidence, such as... the prosecutor's notes or testimony of the prosecutor." Id.

Unlike in the cases cited by Petitioner, the state's "reconstructed" explanation of why the prosecutor dismissed Juror 7243 in this case was properly based on relevant circumstantial evidence – specifically the prosecutor's notes, the voir dire transcript, and her

testimony at the evidentiary hearing.[15]  In her notes regarding Juror
7243, taken contemporaneously with jury selection, the prosecutor
highlighted the juror's work in mental health and victim's advocacy,
indicating that she found this information particularly important.
[RTEH at 40-41, 57 (stating that she wrote down information that was
important to her and highlighted information that was "particularly
important... or noteworthy")]; see Shirley, 807 F.3d at 1104
(circumstantial evidence "may consist of the prosecutor's jury
selection notes"); Crittenden II, 624 F.3d at 957-58 (prosecutor's
notes may constitute evidence of the prosecutor's reasons for striking
a juror);.  Further, the voir dire transcript reflects that prior to
excusing Juror 7243, the prosecutor questioned her at length regarding
her work as a victim's advocate. [RT at 958-59] See Paulino II, 542
F.3d at 701 n.8 ("[A] prosecutor's questions might provide some
evidence of the prosecutor's actual reasons for striking a juror.").
Additionally, at the evidentiary hearing, the prosecutor testified
that she normally would excuse jurors associated with Amnesty
International, particularly in a case involving a confession, because,
in her view, they tend to be "distrustful of government."  [RTEH at
57-58]; see Shirley, 807 F.3d at 1104 (circumstantial evidence may
consist of the prosecutor's "typical or usual practices or approach to
jury selection"); Crittenden I, 624 F.3d at 953, 957-58 (prosecutor's
testimony regarding his systemic practices may constitute evidence of

---

[15]    Petitioner cites Paulino II, 542 F.3d 692, and Bui v. Haley,
321 F.3d 1304 (11th Cir. 2003), but these cases do not support his
position.  In both Paulino II and Bui, there was no evidence
whatsoever reflecting the prosecutors' reasons for their strikes.  See
Paulino II, 542 F.3d at 700-701; Bui, 321 F.3d at 1316.  Here, by
contrast, the prosecutor was able to use her notes, taken
contemporaneously with jury selection, and the voir dire transcript to
sufficiently reconstruct her reasons for excusing Juror 7243.

1  the prosecutor's reasons for striking a juror).  Accordingly, the

2  Court concludes that the state has sufficiently satisfied its burden

3  of production at Batson's step two, "which merely required it to show

4  that the prosecutor would have articulated some race-neutral

5  justification if asked."  Crittenden I, 624 F.3d at 958.

### d.   Step Three – Purposeful Discrimination

7      With respect to the third and final step of the Batson inquiry,

8  and considering the record as a whole, the Court finds that Petitioner

9  has not met his burden of proving purposeful discrimination with

10  respect to the prosecutor's exercise of the peremptory challenge to

11  Juror 7243.  See Batson, 476 U.S. at 93 (at step three of the

12  Batson inquiry, the court is obligated to "undertake a sensitive

13  inquiry into such circumstantial and direct evidence of intent as may

14  be available.").

15     This finding rests on several factors.  First, as noted above,

16  "[s]tep three of the Batson inquiry involves an evaluation of the

17  prosecutor's credibility, ... and 'the best evidence [of

18  discriminatory intent] often will be the demeanor of the attorney who

19  exercises the challenge.'"  Snyder, 552 U.S. at 477 (quoting

20  Hernandez, 500 U.S. at 365); see also Harris, 752 F.3d at 1061-62

21  (stating that the "'best evidence' bearing on the issue of whether an

22  attorney's articulated race-neutral explanation is credible 'often

23  will be the demeanor of the attorney who exercises the challenge,'"

24  and noting that "the district court was able to assess the credibility

25  of [the] prosecutor[]," where the prosecutor had no independent

26  recollection of his reasons for striking the juror in question but was

27  able sufficiently to reconstruct the reasons at the evidentiary

28  hearing (citations omitted)).  In this case, the Court observed the

prosecutor at the evidentiary hearing, and found that her testimony --
specifically with respect to her rationale and practice to excuse
jurors who were advocates for victims of political regimes or who
worked for Amnesty International – was specific and credible. Cf.
Shirley, 807 F.3d at 1108 (discounting import of district court's
determination that prosecutor's testimony was credible because, where
prosecutor could only infer vague reasons for strike based on his
general approach to jury selection, without other supporting
circumstantial evidence, "all the credited testimony could establish
was that the jury selection approach to which [the prosecutor]
testified was 'in fact' his general approach").[16]

Second, it was not unreasonable or implausible for the prosecutor
to believe that someone who worked with victims of government regimes
and for Amnesty International would not be a desirable juror for the
prosecution, particularly in a case involving a confession. See

_____

[16] In this significant regard, the Ninth Circuit's recent
decision in Shirley v. Yates is distinguishable from the case at hand.
In Shirley, the prosecutor could not remember his actual reasons for
striking two African American jurors. With respect to one of those
jurors, he was able only to infer that he struck her because she was
young and he prefers older, more experienced jurors. See Shirley, 807
F.3d at 1099. The Ninth Circuit held that the fact that a
"veniremember (allegedly) lacks a certain je ne sais quoi that the
prosecutor prefers is simply not enough" at Step Three to overcome a
prima facie case. Id. at 1113. In contrast, in this case, the
prosecutor credibly testified to a regular practice of striking jurors
who worked for Amnesty International or other similar groups. The
Ninth Circuit noted in Shirley that a prosecutor's "regular practice
of striking veniremembers who possess an objective characteristic that
may be clearly defined" may be sufficient at Step Three to overcome a
prima facie case. See id. at 1113.

Moreover, in Shirley, the only circumstantial evidence regarding
the prosecutor's reasons for striking the juror was his testimony
about his general practice; and on the other hand, a comparative juror
analysis supported a finding of discrimination at step three. Id. at
1112. In this case, the prosecutor's testimony was bolstered by her
jury selection notes and the transcript of voir dire; and comparative
analysis does not support a finding of discrimination.

<u>Miller-El I</u>, 537 U.S. at 339-40 (in assessing credibility, the court may consider the nexus between the prosecutor's explanation and accepted trial strategies.); <u>Shirley</u>, 807 F.3d at 1108-09 (a prosecutor must offer not "general assertions" but rather a "neutral explanation <u>related to the particular case to be tried</u>.")(quotations omitted)(emphasis in original); <u>Mitleider</u>, 391 F.3d at 1050 ("The prosecutor's motives, however, must be considered on the basis of the facts set forth in each particular case."); <u>Jamerson</u>, 713 F.3d at 1228-29 (noting that the reason for a peremptory strike must be "relevant"; that is, the prosecutor must "express a believable and articulable connection between the race-neutral characteristic identified and the desirability of a prospective juror.").

Third, the record corroborates the prosecutor's explanation regarding why she excused Juror 7243. During voir dire, the prosecutor questioned Juror 7243 at length regarding her work with victims of political regimes. Specifically, the prosecutor asked Juror 7243 if the work that she does is "associated with Amnesty International," and if she had "dealt with people that claim to have given false confessions," indicating that these were issues of importance to the prosecutor. [RT at 958-59.] <u>Cf.</u> <u>Miller-El II</u>, 545 U.S. at 246 ("[T]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination."); <u>Fernandez</u>, 286 F.3d at 1079 (noting that "the prosecutor failed to engage in meaningful questioning of any of the minority jurors."). Furthermore, it appears from the transcript that the answers to the prosecutor's questioning did not allay her concerns. Rather, when the prosecutor asked Juror 7243 if there was

48

anything about her work that would "affect the way [she] would look at
the police in this case," or "might make [her] more sympathetic to any
of the parties in this case," Juror 7243 responded, "I don't think
so." [RT at 958.] It is reasonable that the prosecutor would
interpret this response as equivocal. [See RTEH at 59-61, 75.]

Fourth, as noted previously, race and race discrimination were
not at issue in this case, and the stricken jurors were not of the
same race as Petitioner. These factors also weigh against the finding
of an inference of discrimination. See, e.g., Powers, 499 U.S. at
415-16 (noting that it may be difficult to make a prima facie showing
when the potential juror and the defendant are of different races);
Johnson v. Campbell, 92 F.3d at 953–54 (insufficient prima facie case
for exclusion based on sexual orientation where neither sexual
orientation nor other discrimination was at issue in case and there
were neutral reasons for challenge).

The weight of these reasons for finding that the prosecutor did
not purposefully discriminate is not persuasively countered by
Petitioner's arguments to the contrary. Significantly, a comparison
of Juror 7243 with empaneled jurors fails to support a conclusion that
the prosecutor's proffered explanation for dismissing her was
pretextual. See Miller-El II, 545 U.S. at 241 (comparative juror
analysis is a useful tool at Batson's step three). Petitioner
compares Juror 7243 to Juror 7165, who served as an alternate juror,
pointing out that Juror 7165's wife was a registered nurse at County
Mental Health. [See Pet.'s Post-Evid. Brief at 12-13, 17-18.]
However, Juror 7165 was not similarly situated to Juror 7243 as it was
not the juror, himself, but rather his wife, who worked in mental
health, and, unlike Juror 7243, Juror 7165 was not an advocate for

49

victims of "government regimes" and did not work for a group such as Amnesty International.  [See RT at 1023.]

Petitioner also points to the fact that the prosecutor noted Juror 7243's race, but did not note the race of any other juror. [Pet.'s Post-Evid. Brief at 18 n.17.] This fact may properly be considered as possible evidence of discrimination.  See, e.g., Miller-El I, 537 U.S. at 347 ("The supposition that race was a factor could be reinforced by the fact that the prosecutors marked the race of each prospective juror on their juror cards."); Adkins v. Warden, Holman CF, 710 F.3d 1241, 1253 (11th Cir. 2013)(where the prosecutor "explicitly noted the race of every black veniremembers, and only black veniremembers, on the jury list the prosecutor relied upon in striking the jury, marking each of them with a 'BM' or 'BF,'" the court found this to be "strong evidence of discriminatory intent."); Green, 532 F.3d at 1033 (finding Batson violation where prosecutor used peremptory challenges to eliminate all six African-Americans from the seated jury pool and also "noted the race of each venire member he struck from the jury pool").  However, it is not enough on its own to prove discriminatory intent.  See United States v. Barnette, 644 F.3d 192, 203 (4th Cir. 2011)("[T]he Miller-El Court found the practice [of noting the race of jurors] problematic only when viewed alongside the district attorney's office's policy of systematically excluding blacks from juries.").  Indeed, there are numerous innocuous reasons why a prosecutor might note the race of a juror.  See, e.g., Barnette, id. (Petitioner "has failed to present any evidence suggesting that [the prosecutor's practice of noting the race of jurors] was anything more than a way for the prosecutors to identify jurors.").  Here, the prosecutor was not asked  why she noted the juror's race, and there is

1   otherwise no indication in the record that she made the notations for
2   any improper purpose.

3        Nor is the credibility of the prosecutor's race-neutral rationale
4   refuted by Petitioner's argument that the prosecutor discriminated in
5   striking Juror 8053 and in the selection of Itaev's jury, thereby
6   establishing a pattern of discrimination.  [See Pet.'s Post-Evid.
7   Brief at 17-19.]  For the reasons discussed above with respect to
8   Juror 8053, Petitioner fails to establish that the prosecutor acted
9   with discriminatory intent when she struck that juror.  The same is
10  true regarding the selection of Itaev's jury.  The prosecutor was not
11  required to give her reasons for striking Juror 1245 or Juror 3052,
12  two of the African-Americans in Itaev's jury pool [RT at 362-63], and
13  Petitioner's speculation regarding why the prosecutor excused these
14  jurors is insufficient to prove discriminatory intent.  As for Juror
15  8493, the prosecutor stated that she excused him because he had been
16  on a hung jury.  [RT at 398-40.]  This is a valid, race-neutral reason
17  for excusing a juror.  See, e.g., Ngo v. Giurbino, 651 F.3d at 1116;
18  Graham v. Harrington, 2013 WL 4052559, at *25 (C.D. Cal. Aug. 9,
19  2013)("A juror's past service on a hung jury is a legitimate race-
20  neutral reason for exercising a peremptory strike.").  Further,
21  Petitioner has not provided any evidence indicating that this reason
22  was pretextual, and a comparative juror analysis shows that none of
23  the seated Itaev jurors were similarly situated.

24       For the foregoing reasons, the Court concludes that Petitioner
25  has failed to prove that the prosecutor's challenge of Juror 7243 was
26  racially motivated; having thus failed to establish a constitutional
27  violation under Batson, he is not entitled to federal habeas relief on
28  this claim.

**C.   CLAIM THREE: INSTRUCTIONAL ERROR**

In his third claim for relief, Petitioner contends that the trial court erred in refusing his request to instruct his jury regarding heat-of-passion voluntary manslaughter.  He argues that sufficient evidence supported giving the instruction -- specifically, the discovery of the unused condom on the apartment floor and Itaev's statements to his uncle Gary that the victim Markzitser wanted to have sex with Lane and that Itaev taunted and provoked Petitioner with this information.  According to Petitioner, the jury could reasonably conclude, based on this evidence, that he acted in the heat of passion.  [Petition at 5; Pet. P&A at 45-49.]  As discussed below, this claim does not warrant habeas relief.

**1.   Trial Court Proceedings**

At trial, Petitioner's counsel requested that the court instruct the jury regarding heat-of-passion voluntary manslaughter.  The following exchange occurred:

Counsel:       I'm going to ask the court – I suspect I'm going to lose on this one.  And the reason I'm bringing it up, even though the people are not arguing that, and I'm certainly not arguing that there was evidence that this whole incident occurred as a result of a fight based on jealousy. Now, the jury could believe that.  And I think that there is some evidence to support that, that it could have been a fight based on jealousy.  I would ask for the manslaughter instructions.

The Court:     Okay.  That one, I'm sorry.  I just don't see it. I know there was some discussions in opening

1                        statement and there was some cross-examination,
2                        but there is nothing in terms of the evidence
3                        that's been presented in the case to confirm that.
4          Counsel:      Your honor, if I may?  The statement given by
5                        Mr. Itaev to - the first statement to the
6                        police officer, that's the story that he
7                        gives, that it was a - that there was a
8                        kissing of Audrey.  There was an attempt to
9                        have sex.  [Petitioner] got upset.  I'm not
10                       saying I'm going to argue that, but that's
11                       the evidence.  And if the jury believed that
12                       evidence - I mean, I'm not saying it's not
13                       true...  I'm not even going to argue that.
14                       I'm saying there is some evidence in front of
15                       my jury.  And, I mean, they could totally
16                       disregard my argument and [the prosecutor's]
17                       argument and believe Itaev's statement.
18         The Court:    The problem that you have with the evidence in the
19                       case is that if that were the case, I mean, you
20                       still have what appears to be very strong evidence
21                       that there was a robbery that occurred there.  I
22                       mean, a man was apparently tied up, he was killed,
23                       and it didn't look like it's the kind of struggle
24                       that would match counsel's suggestion that there
25                       was a dispute as to jealousy.
26         Counsel:      I'm not going to argue strenuously for that one,
27                       but I thought we had some evidence of it.
28  [RT at 2749-50.]  Ultimately, the trial court denied Petitioner's

1  request.  [RT at 3143.]

2      **2.  Court of Appeal Opinion**

3      Petitioner raised his instructional error claim on direct appeal.

4  The California Court of Appeal denied the claim, finding that the

5  trial court "properly ruled that insufficient evidence existed to

6  support instructing the jury regarding heat-of-passion voluntary

7  manslaughter."  [Lodg. 8 at 20.]   The  appellate court explained:

8          [Petitioner] contends the court erred in refusing his

9      request to instruct the jury regarding heat-of-passion

10     voluntary manslaughter.  He argues sufficient evidence

11     supported giving the instructions: Markzitser wanted to have

12     sex with Lane, based on Itaev's statements to Gary and the

13     discovery of the unused condom on the apartment floor,

14     [Petitioner] learned of this interest and became jealous,

15     Itaev taunted and provoked him with this information, and

16     thus that the jury reasonably could conclude that he killed

17     the victim while provoked into a heat of passion.  He also

18     suggests that the jury's rejection of first degree murder

19     reinforces his contention by showing a rejection of the

20     prosecution's trial theory.  The contention lacks merit.

21     Sudden quarrel – heat-of-passion voluntary manslaughter

22     is a lesser included crime of murder.  The court must

23     instruct the jury regarding a lesser included crime sua

24     sponte if substantial evidence would support a guilty

25     verdict of the lesser included rather than the charged

26     crime, even if the defendant objects or the lesser included

27     crime is inconsistent with his trial theory.  "Conversely,

28     even on request, the court 'has no duty to instruct on any

1   lesser offense unless there is substantial evidence to

2   support such instruction.'  "'Substantial evidence is

3   evidence sufficient to 'deserve consideration by the jury,'

4   that is, evidence that a reasonable jury could find

5   persuasive.'" On appeal, we review independently the

6   question whether the trial court failed to instruct on a

7   lesser included offense."

8        A defendant seeking to mitigate a killing from murder

9   to heat of passion voluntary manslaughter must demonstrate

10  heat of passion <u>and</u> provocation.  "The heat of passion

11  requirement for manslaughter has both an objective and a

12  subjective component.  <u>The defendant must actually,</u>

13  <u>subjectively, kill under the heat of passion</u>.  But the

14  circumstances giving rise to the heat of passion are also

15  viewed objectively... [T]his heat of passion must be such a

16  passion as would naturally be aroused in the mind of an

17  <u>ordinarily reasonable person</u> under the given facts and

18  circumstances, because <u>no defendant may set up his own</u>

19  <u>standard of conduct and justify or excuse himself because in</u>

20  <u>fact his passions were aroused, unless further the jury</u>

21  <u>believe that the facts and circumstances were sufficient to</u>

22  <u>arouse the passions of the ordinarily reasonable man</u>."

23  Moreover, "the provocation which incites the killer to act

24  in the heat of passion case <u>must be caused by the victim or</u>

25  <u>reasonably believed by the accused to have been engaged in</u>

26  <u>by the decedent.</u>"

27       Applying these principles to our facts, the court

28  properly refused [Petitioner's] request.  First, there was

55

insufficient evidence that, at the time of the killing, [Petitioner] subjectively acted in a heat of passion.  In his post-arrest statement, [Petitioner] did not claim he killed Markzitser in a heat of passion caused by jealousy or any other emotion, and made no mention of any sexual advances by the victim.  Rather, [Petitioner] explained that he killed the victim to carry out Itaev's plan to subdue Markzitser and take over the apartment, and his only motive was fear that Itaev would harm Lane if he failed to implement Itaev's plan.  Lane denied the victim made any sexual advances.  During the ride with Gary to the motel, [Petitioner] was calm, describing the murder as "something he did for a living," circumstantially negating any inference that he killed Markzitser in a jealous rage.

Second, the only evidence that the victim made any sexual advances came from Itaev's statements that he told [Petitioner] of Markzitser's alleged sexual interest in Lane, which Itaev said made [Petitioner] jealous.  Even if Itaev taunted [Petitioner] about Markzitser's alleged interest in Lane, such conduct cannot constitute provocation because it was insufficient to provoke a <u>reasonable</u> person into a heat-of-passion.

Contrary to [Petitioner's] arguments, neither the presence of the condom on the apartment floor nor the jury's rejection of a first degree murder verdict alters our conclusion.  As to the condom, there is no evidence that [Petitioner] knew it was there.  In any event, the condom's presence demonstrates neither subjective nor objectively

1    reasonable heat-of-passion.  The jurors' acquitting

2    [Petitioner] of first degree murder shows only that they did

3    not believe he committed felony murder and does not suggest

4    that they thought he acted in a heat-of-passion or that they

5    would have convicted him of voluntary manslaughter had they

6    been offered that alternative.  The court properly ruled

7    that insufficient evidence existed to support instructing

8    the jury regarding heat-of-passion voluntary manslaughter.

9  [Lodg. 8 at 17-20 (emphasis in original) (citations and quotations

10 omitted).]

11      **3.  Discussion**

12      Federal habeas corpus review is available to correct violations

13 of federal law only.  28 U.S.C. § 2254(a); Estelle v. McGuire, 502

14 U.S. at 68.  Thus, insofar as Petitioner's claim rests on an assertion

15 that the trial court's failure to instruct on heat-of-passion

16 voluntary manslaughter was erroneous under state law, the claim does

17 not afford a cognizable basis for federal habeas relief.  Menendez v.

18 Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005) (citing Estelle, 502 U.S.

19 at 67-68).  Nor may this Court independently review the court of

20 appeal's holding that California law did not entitle Petitioner to a

21 "heat of passion" instruction in this case.  See Waddington v.

22 Sarausad, 555 U.S. 179, 192 n.5, 129 S. Ct. 823 (2009)("[W]e have

23 repeatedly held that 'it is not the province of a federal habeas court

24 to reexamine state-court determinations on state-law questions.'"

25 (quoting Estelle, 502 U.S. at 67-68)); Bradshaw v. Richey, 546 U.S.

26 74, 76, 126 S. Ct. 602 (2005) ("[A] state court's interpretation of

27 state law ... binds a federal court sitting in habeas corpus.").

28      Petitioner's claim is equally unavailing as a matter of federal

law.  Controlling authority holds that a state court criminal defendant in a non-capital case does not have an established constitutional right to jury instructions on a lesser included offense.  See Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998)("Under the law of this circuit, the failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question."); see also United States v. Rivera-Alonzo, 584 F.3d 829, 834 n.3 (9th Cir. 2009)("In the context of a habeas corpus review of a state court conviction, we have stated that there is no clearly established federal constitutional right to lesser included instructions in non-capital cases." (citing Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000)); Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984)(same); cf. People v. Breverman, 19 Cal. 4th 142, 165 (1998)(rejecting "any implication that the alleged error at issue in this case – the failure to instruct sua sponte on an uncharged lesser included offense, or any aspect thereof – is one which arises under the United States Constitution").

An exception to this general rule may be justified in some instances, based upon a defendant's constitutional right to receive adequate jury instructions on his theory of the case.  Solis, 219 F.3d at 929.  However, to fall under such an exception, there must be substantial evidence to support a finding on the lesser offense within the substantive parameters of state law.  Id.  Here, for the reasons set out in the state court of appeal's opinion, that was not the case.  See Miller-El I, 537 U.S. at 340 (absent clear and convincing evidence to the contrary, a state court's factual finding is entitled to a presumption of correctness)(citing 28 U.S.C. § 2254(e)(1)); Menendez, 422 F.3d at 1029 (affording presumption of correctness to state court

determination that evidence does not support a lesser offense instruction). There was nothing substantial in the evidence at Petitioner's trial which would have supported submission to the jury on "heat of passion" as a possible basis for a verdict of manslaughter under California law; nor was any such theory of defense actually advanced by Petitioner.[17] Therefore, there was no constitutional error in the omission of this instruction. See Menendez, 422 F.3d at 1029-30 (agreeing with state court's finding that evidence did not support imperfect self-defense instruction under California law and concluding that "[c]onsequently, the state court's decision was not error, let alone a violation of due process"); Solis, 219 F.3d at 929-30 (finding no constitutional error in denial of lesser included voluntary and involuntary manslaughter instructions based on agreement with state court of appeal's determination that "there was not substantial evidence to support either charge").

In sum, because the California Court of Appeal reasonably concluded that the evidence presented at trial did not support a voluntary manslaughter instruction, habeas relief is not warranted on this claim.

//

_____

[17] Indeed, at trial, Petitioner did not argue that he acted in the heat of passion. Instead, Petitioner's primary defense theory was that Itaev, and not Petitioner, committed the murder. [See, e.g., RT at 1281, 3314-24.] During closing arguments, Petitioner's counsel contended that Itaev made up "the story" that the victim wanted to have sex with Lane and that Petitioner became jealous. According to Petitioner's defense, Itaev deliberately left the condom in the victim's apartment to "stage[] the scene to make it look like there was some kind of a romantic entanglement going on, some kind of sex stuff which would support his story that [Petitioner] became jealous and killed him." [RT at 3330.] The prosecutor also agreed, "it did appear from the evidence that there was an attempt [by Itaev] to stage some sort of a sexual liaison, maybe some sort of heat of passion, lovers' quarrel kind of thing." [RT at 3346.]

**VI.   RECOMMENDATION**

For the reasons discussed above, it is recommended that the District Court issue an order accepting this final Report and Recommendation and directing that judgment be entered denying the petition and dismissing this action with prejudice.


DATED:  <u>May 13, 2016</u>



_____
LOUISE A. LAMOTHE
United States Magistrate Judge